**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Custom Homes by Via LLC et al,               )     No. CV 12-01017-PHX-FJM
                                             )
                    Plaintiffs,              )     **ORDER**
                                             )
vs.                                          )
                                             )
Bank of Oklahoma,                            )
                                             )
                    Defendant.               )
                                             )
_____     )

        This is an action by a borrower (Custom) against a lender (Bank of Oklahoma or Bank) for breach of a loan agreement and for breach of the implied covenant of good faith and fair dealing inherent in every contract. The case was tried to the court without a jury. These are the court's findings and conclusions under Rule 52(a), Fed. R. Civ. P.

                                            I.

        In our Order of Oct. 25, 2013 (doc. 67) we granted summary judgment in favor of Custom on the liability portion of its claim for the failure of the Bank of Oklahoma to fund the May 27, 2008 draw request. All that remained of that claim was a determination of damages. The remaining claim to be tried included both liability and damages on Custom's claim that the Bank of Oklahoma failed to extend the maturity date to January 2009 even though all conditions for the extension had been satisfied.

        From the very beginning of the contact between Custom and the Bank of Oklahoma,

the Bank knew that the line of credit would extend to two years because it would take at least that long for the Enclave project to be completed.  In the words of Exhibit 62, the additional 12 months was to be "auto[matic]."  An optimistic "quick estimate" of 19 months  was given to the Bank.  Exhibit 59.  The Bank was interested in offering a line of credit of $4 million for 12 months plus one 12 month extension as long as Custom was not in default, paid a fee, and, if elected by the Bank, a reappraisal would reveal an 85% loan to value ratio.  Exhibit 63.

On January 17, 2007, the parties entered into a binding loan agreement, Exhibit 28, and accompanying promissory note, Exhibit 29, in which the Bank would lend $1,908,250 for 12 months with an automatic extension of an additional 12 months if four conditions were satisfied: (1) Custom gives the Bank written notice that it wants the extension, (2) Custom pays a fee, (3) Custom is not in default, and (4), the Bank approves an updated appraisal on the Enclave showing the 85% loan to value ratio.  Exhibit 29 at 2.  The appraisal is "as defined in the Loan Agreement," id., which is defined as an appraisal "ordered by the Bank." Exhibit 28 at 1.  The collateral, however, was Gateway Norte, not the Enclave.

On September 28, 2007, 9 months into the first 12 month period, the parties amended their contract to increase the loan amount to $3,973,750, to provide working capital as well as to fund infrastructure.  Exhibit 27 at 5.  The note was not modified to extend its term. Either the Bank expected all $3.9 million to be disbursed in 3 months or the Bank fully expected to extend the term of the note at some point in the next 3 months.  Obviously, the Bank fully expected to extend the term.  The funds were not limited to infrastructure.  They could be used for working capital.

The Bank knew all along that Custom wanted and needed the second year.  The whole course of dealings between the parties showed from beginning to end that the expectation was for the second year.  Why else did the Bank double the loan amount 9 months into the first 12 months?  Indeed, the Bank expected to do "the extension in Jan.," Exhibit 136. Custom asked for a second year and the Bank knew it. Exhibit 106.

On January 17, 2008, upon completion of the first year, the parties modified their

agreement to extend the term of the note to April 17, 2008. Exhibit 26. Both sides knew that the project would not be completed in 3 months. Why such a piecemeal, short-sighted approach? If the conditions had been satisfied to justify an extension at all, why for a period that the Bank knew was insufficient to complete the project? Incredibly, the Bank did it again on April 17, 2008, extending the loan term to June 1, 2008, for yet another piecemeal 45 days! Exhibit 25. It knew all along, in writing and otherwise, that Custom wanted the second year. See, for example, Exhibit 106. The Bank failed to order an appraisal of the correct property in time to satisfy itself, and yet claimed that the conditions for extension under the note were not satisfied. The condition for an appraisal in the note referred to the "Real Property," defined in the Loan Agreement as *not* the "Secured Property." Exhibit 28 at 2. And yet the Bank extended the term of the note by 45 days to get an appraisal on the "Secured Property." Exhibit 75. This was not even a condition of the extension. The Real Property was the Enclave. The Secured Property was Gateway Norte. Even if an appraisal on the Secured Property was a condition for the extension, the Bank did not even ask for an appraisal until May 27, 2008, four days before the last extension was to expire. Exhibit 83. The appraisal was at the Bank's option. It can't blame Custom for not satisfying the condition.

To add insult to injury, the Bank was willing to extend the term for yet another 45 days, but at half the then existing loan amount. Exhibit 127.

## II.

The Bank had a contractual obligation to fund the loan for working capital. It had a contractual obligation to extend the loan for a second year as long as the conditions were satisfied. All conditions were satisfied. The Bank had written and oral notice all along. Custom was ready, willing and able to pay the fee, if only the Bank identified the amount. And the Bank had no right to condition the extension on an appraisal of anything other than the Enclave. Even if the Bank had a right to condition the appraisal on Gateway Norte, the Bank failed to exercise that right in a timely fashion. In essence, it waived its right. And, of course, Custom was not in default.

1    The testimony was overwhelming that all along the Bank was more interested in its
2  collateral in Gateway Norte than whether the Enclave project would succeed.  *See, e.g.,*
3  Transcript of Nov. 20, 2013 at 64-65.  But once it entered into its loan agreement, the Bank
4  had a legal obligation to exercise good faith and deal fairly with Custom.  It failed to do so.
5  The Bank acted like an adversary, considering only its own interests, while ignoring the
6  interests of Custom.  Under Arizona law, a party to a contract has an obligation to refrain
7  from doing anything that will impair the other party's contractual rights.  Indeed, a party can
8  breach the covenant of good faith and fair dealing even if it strictly complies with its
9  contract. *Zilisch v. State Farm Mutual Auto Ins. Co.,* 196 Ariz. 234, 237-38, 995 P. 2d 276,
10  279-80 (2000).  This is true whether the action lies in contract (as here) or in tort.

11    We conclude that the Bank breached its express contract with Custom in failing to
12  extend the loan for the second year.  We also conclude that the Bank breached the covenant
13  of good faith and fair dealing inherent in its contact with Custom.  It dealt shabbily with its
14  borrower.  The borrower was over a barrel and the Bank failed to do what it was required to
15  do under the contract and in good faith.

16                                          III.

17    We also find and conclude that the Bank's breaches caused Custom damages.  The
18  failure to fund the May 28, 2008 draw request and the failure to extend the term of the loan
19  for the second year were substantial contributing factors in the failure of the Enclave project.
20  Given the difficulty in determining the damages proximately caused by the Bank's breaches,
21  Custom has elected to be put in the position it would have been in had it never contracted
22  with the Bank. It seeks the value of the collateral foreclosed on, the amount of interest it paid
23  the Bank and the fees it paid the Bank.  The parties have stipulated that the interest was
24  $289,881.58 and that the loan fees were $14,312.00. Thus, all that remains is a determination
25  of the value of the collateral.  The measure of damages for breach of contract to loan money
26  includes the loss of equity if the breach of the loan agreement caused the borrower to lose
27  ownership of its assets. *United Cal. Bank v. Prudential Ins. Co.*, 140 Ariz. 238, 296, 681
28  P.2d 390, 448 (Ct. App. 1984).  The value of the equity is established at the time the title is

1   lost—here, on the date of foreclosure.  *Id.* (citation omitted).  Given the rapidly falling

2   market, given the lack of confidence we have in any of the appraisals, we find the fairest

3   value to be that at which the Bank bid at foreclosure, $2.1 million.  And where, as here, the

4   breach causes the loan proceeds to be useless, no offset is warranted.

5         Accordingly, we find in favor of Custom and against the Bank of Oklahoma in the

6   amount of $2,404,193.58.  The clerk shall enter final judgment in favor of plaintiffs in this

7   amount.  It is further ORDERED DENYING all pending motions for directed verdict.

8         DATED this 23rd day of December, 2013.

9

10   _Frederick J. Martone_

11   Frederick J. Martone
     Senior United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28